1  DANIEL ROBERT BARTLEY, CA Bar No. 79586
   Post Office Box 686
2  7665 Redwood Boulevard
   Novato, CA  94948-0686
3  Telephone 415 898 4741  Fax 415 898 4841
   E-mail DanielBartleyLaw@aol.com
4
   NANCY G. KROP, CA Bar No. 133723
5  1534 Plaza Lane, No. 322
   Burlingame, CA  94010
6  Telephone 650 344 5306  Fax 650 344 5307
   E-mail  nkrop@kroplaw.com
7
   Attorneys for Mary Hendow, Julie Albertson, Relators
8

9              UNITED STATES DISTRICT COURT

10           EASTERN DISTRICT OF CALIFORNIA

11

12 UNITED STATES OF AMERICA, *ex rel.*      Case No. CIV.S-03-0457 GEB DAD
   MARY HENDOW and JULIE
13 ALBERTSON,

14                                          **SECOND AMENDED COM-
                                            PLAINT FOR DAMAGES, WITH
15                      Plaintiffs,         DEMAND FOR JURY TRIAL**

16

17 vs.                                      Causes of Action:

18                                          1.  Knowingly False Statements to Get a
                                            False or Fraudulent Claim Paid or
19 UNIVERSITY OF PHOENIX and DOES 1-        Approved, in Violation of the False Claims
   500, Inclusive,                          Act, 31 U.S.C. § 3729(a)(1).
20
                                            2. Knowingly False Records or Statements
21                                          to Get a False or Fraudulent Claim Paid or
                      Defendants.           Approved, in Violation of the False Claims
22                                          Act, 31 U.S.C. § 3729(a)(2).

23

24

25

26

27

28

---

*United States of America ex rel. Hendow v. University of Phoenix*                    -1-

PLAINTIFF'S
EXHIBIT
22

1    Plaintiffs and Relators Mary Hendow and Julie Albertson allege as follows:

2                                    **I. Introduction**

3         1. (a) This is an action to recover damages and civil penalties on behalf of the United

4    States of America arising out of false claims approved and presented by Defendants to obtain

5    over one-half billion dollars annually from the United States Department of Education pursuant

6    to the Higher Education Act, Title IV ("HEA"), from at least January 1, 1997, continually

7    through the present. (b) Defendant University of Phoenix ("UOP") is the largest recipient of

8    HEA federal student financial aid funds from the United States Department of Education. (c) In

9    requesting and receiving at least one-half billion dollars annually, Defendants falsely represent

10   every year that they are in compliance with HEA's prohibition against using incentive payments

11   for recruiters for recruiting activities, which is a core prerequisite to eligibility for the Title IV

12   funds. (d) Defendants had, and continue to have, actual knowledge that they are not adhering to

13   the HEA ban, that their representations of adherence were and are false, and that they therefore

14   were and are submitting false or fraudulent representations of compliance. (e) Alternatively,

15   Defendants act and acted with deliberate indifference and/or reckless disregard as to the truth or

16   falsity of the claims. (f) Relators assert causes of action under the False Claims Act for

17   submission of a knowingly false or fraudulent claims for payment or approval, and knowingly

18   false records or statements to get a false or fraudulent claim paid or approved, in violation of 31

19   U.S.C. § 3729(a)(1) and (2).

20

21                             **II. Jurisdiction and Venue**

22        2. (a) This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et

23   seq., and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. (b) This case arises

24   from the wrongful conduct of the Defendants incident to obtaining funds from the United States

25   of Department of Education pursuant to the Higher Education Act, Title IV.

26        3. This Court has in personam jurisdiction over the Defendants under 31 U.S.C. §

27   3732(a), which authorizes nationwide service of process.

28        4. (a) 31 U.S.C. § 3732(a) provides "Any action under section 3730 may be brought in

     any judicial district in which the Defendant or, in the case of multiple Defendants, any one

1  Defendant, can be found, resides, transacts business, or in which any proscribed by section 3729

2  occurred." (b) Venue is proper in the Eastern District of California because Defendants maintain

3  and operates its Sacramento campus within this District.

### III. Plaintiffs

5      5. (a) *Qui Tam* Plaintiff Mary Hendow (hereinafter "Hendow") is a citizen of the United

6  States of America and is a resident of Santa Clara County, in the State of California. (b) Hendow

7  has worked for defendant UOP from April 1997 through the present as an Enrollment Counselor

8  at defendant's Northern California campus. (c) Hendow brings this action on behalf of the United

9  States of America.

10     6. (a) *Qui Tam* Plaintiff Julie Albertson (hereinafter "Albertson") is a citizen of the

11  United States of America and is a resident of San Mateo County, in the State of California. (b)

12  Albertson has worked for defendant UOP from April 2000 through the present as an Enrollment

13  Counselor at defendant's Northern California campus. (c) Albertson brings this action on behalf

14  of the United States of America.

15     7. (a) As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relators, simul-

16  taneously with the filing of this Complaint, provided to the United States Attorney for the

17  Eastern District of California a statement of all material evidence and information related to this

18  Complaint. (b) This disclosure statement supports the existence of "submission of a knowingly

19  false or fraudulent claim for payment or approval," under the False Claims Act (31 U.S.C. §

20  3729(a)(1)).

21     8. The United States of America is here named a plaintiff because funds of the United

22  States of America ("Federal funds") were and are awarded to defendant UOP, pursuant to the

23  HEA, Title IV, as a result of the false claims alleged in this Complaint.

### IV. Defendants

25     9. (a) Defendant UOP is the nation's largest private, for-profit higher education

26  institution providing educational programs for working adult students. (b) UOP maintains four

27  campuses in California, including its Sacramento campus located within the jurisdiction of this

28  Court. (c) UOP has approximately 45 campuses nationwide and an online program, enrolling

1   approximately 174,900 students.  (d) Each campus has multiple sites, also known as learning

2   centers.  (e) The bulk of UOP's revenue arises from its online program (founded in San

3   Francisco), and its California campuses: (1) Sacramento (seven sites); (2) Northern California

4   (nine sites, based in Pleasanton); (3) Southern California (twelve sites); and (4) San Diego (seven

5   sites).  (f) UOP was founded in Phoenix, Arizona, in 1976.  (g) UOP is accredited by the Higher

6   Learning Commission and is a member of the North Central Association of Colleges and

7   Schools.  (h) Through its online program, and learning centers, UOP offers certificate programs,

8   and graduate and undergraduate degree programs.

9       10.  (a) Relators are unaware of the true names and capacities of the Defendants sued as

10   Does 1 through 500.  (b) Plaintiffs will amend their complaint when the true names and

11   capacities have been ascertained.  (c) Each Doe Defendant is responsible in some actionable

12   manner for the events, occurrences, injuries and damages alleged herein.

13       11.  The terms "Defendants" will refer collectively to the aforesaid Defendants acting by

14   and through their managerial employees, and each of them.

15       12.  Managerial employees of the Defendants, in doing the acts and things described in

16   this complaint, were acting within the course and scope of their respective agencies and/or

17   employment with the Defendants, and each of them, with the knowledge and consent of the

18   Defendants, and each of them, unless otherwise indicated.

19       13.  At all relevant times each Defendant was the authorized agent of each other

20   Defendant.

21           **V.  Specific False Claims and Fraudulent Statements**

22   **A.      Summary of the Fraudulent Conduct**

23       14.  (a) HEA, Title IV, prohibits colleges and universities from providing "any

24   commission, bonus or other incentive payment . . ." to recruiters based on recruiting activities.

25   HEA, sections. 487(a) and 487(a)(20).  (b) The statutory ban was enacted 1992 amid reports of

26   numerous institutions enrolling unqualified students, just to receive the federal student-aid funds

27   from the United States Government.  (c)  The statutory incentive compensation ban is a core

28   prerequisite for an educational institution's eligibility to request and receive Title IV funds.

15. (a) The United States Government awards approximately $6 billion a year to help students obtain their educations at colleges and vocational schools. (b) The federal funds, however do not go to the students. (c) Instead, the educational institution requests the funds of the United States Department of Education or a third party intermediary lender. (d) The United States Government or the lender wires the funds directly into the institutions' accounts. (e) The institutions then credit their students for tuition.

16. (a) Students are responsible for paying back the United States Government once they graduate or stop attending the university. (b) Students disqualified from a university must still repay the federal loans. (c) These students, unable to complete their education and obtain a decent paying job to repay their federal loans, are forced into dire financial situations. (d) Or, rather than being dropped from UOP, UOP requires the students to take additional courses, costing them on average $1,000 per course. (e) The institutions, meanwhile, retain the fraudulently obtained federal funds.

17. (a) UOP, in flagrant violation of the Title IV ban, compensates enrollment counselors, including Relators, based directly upon enrollment activities. (b) UOP publishes charts (called matrix) setting forth the enrollment activity numbers necessary for a performance rating (such as "exceeds expectations" or "meets expectations"). (c) Along with the matrix charts, UOP publishes its salary schedules, with a salary range corresponding to each performance rating. (d) An enrollment counselor thus knows his or her salary range, based on her enrollment activities level. (e) UOP furthermore "stack ranks" counselors based upon their number of enrollments. (f) The top ranking counselors are among the highest paid counselors, receiving the highest salary as well as incentive trips, awards and gifts based upon their enrollment numbers.

18. (a) To boost its enrollment numbers, UOP Corporate Enrollment urges enrollment counselors to enroll students without reviewing their transcripts to determine their academic qualifications to attend the university. (b) This process leads to student disqualification from UOP (or additional financial costs for the students to take additional classes) and financial disaster for the students forced to repay the federal loans while UOP collects the federal funds for

1  these fraudulently "enrolled" students.

2      19. (a) *UOP is fully aware of the illegality of its compensation scheme.* (b) UOP senior

3  management openly brag to UOP employees about duping the federal government regarding the

4  UOP compensation scheme. (c) They boast that they create "smoke and mirrors" so that UOP

5  can "fly under the radar" of the United States Department of Education regarding its illegal

6  compensation scheme.

7      20. (a) UOP disguises its illegal compensation scheme in many ways. (b) UOP retitles

8  documents to mask the illegal compensation scheme. (c) For example, until recently, UOP titled

9  its monthly reports to enrollment counselors verifying student enrollments "*Commissioned*

10 *Starts*"("starts" refers to student enrollments). (d) UOP creates its "stack rankings" from these

11 reports. (e) Once the federal government began fining institutions for violating the HEA

12 incentive compensation ban, UOP continued its compensation scheme and simply renamed the

13 reports, removing the "commissioned starts" from the document title.

14     21. (a) To further mask its illegal compensation scheme, UOP maintains separate review

15 files on the enrollment counselors. (b) One file contains legitimate review criteria produced to

16 the federal government, and the other secret file containing the actual, illegal quantitative

17 enrollment review criteria.

18     22. UOP also developed a glossary of "code words" used in documents to further

19 disguise that compensation is based solely on enrollment activities.

20 **B.    UOP's False Certifications of Compliance to the Government, Required by Law for**
21 **Eligibility to Receive the Federal Funds**

22     23. (a) Educational institutions request Title IV funds for eligible students through

23 several programs, including the Federal Pell Grant Program ("Pell"),the Federal Supplemental

24 Educational Opportunity Grant Program ("FSEOG"), the Federal Perkins Loan Program

25 ("Perkins") and the Federal Family Education Loan Program ("FFELP").

26     24. (a) For an educational institution to be eligible to receive these Title IV grant

27 funds, the federal statutes and regulations require the institution to certify to the United States

28 Government that the institution will comply with the incentive compensation ban through a

Program Participation Agreement ("Agreement"). HEA, Sec. 487(a) and (a)(20); 34 C.F.R. Sec.

1    668.14(a)(1) and (b)(22)). This certification is a core prerequisite for an institution's eligibility

2    to request and receive Title IV funds.

3        25. (a) An educational institution is ineligible to receive Title IV funds without the

4    Agreement certification of compliance with the incentive compensation ban. (b) The Agreement

5    conditions the initial and continued participation of an eligible institution in any Title IV, HEA

6    program. (c) The Agreement expressly states, in bold print, highlighted in a box on the first

7    page:

8            The execution of this Agreement by the Institution and the Secretary is a
             prerequisite to the Institution's initial or continued participation in any Title IV,
9            HEA Program.

10       26. The Agreement's first paragraph furthermore provides that the institution's

11   participation in the Title IV program is "subject to the terms and conditions of this Agreement."

12       27. (a) One of the "terms and conditions" of the Agreement is the incentive

13   compensation ban. (b) In the Agreement, the educational institution certifies that "[i]t will not

14   provide . . . any commission, bonus or other incentive payment based directly or indirectly on

15   success in securing enrollments . . . (Agreement, p. 5, para. 22, quoting directly from the HEA,

16   Sec. 487(a)(2) and the federal regulations, 34 C.F.R. Sec. 668.14(b)(22)).

17       28. (a) Educational institutions violating the incentive compensation ban must return the

18   Title IV funds, along with interest and special costs incurred by the DOE. (b) For example,

19   University of La Verne was directed to refund $6,528,981 FFELP funds and $395,730 in Pell

20   funds. (c) On December 13, 2001, Benedictine University was directed to return $25,521 Pell

21   funds, $183,407 FFELP funds, and $13,060 FSEOG funds. (d) On September 4, 2002, Southern

22   Wesleyan University was directed to return $18,346,658 FFELP funds, $1,079,565 Pell funds,

23   $21,400 FSEOP funds, and $3,500 Perkins funds.

24       29. (a) UOP, in requesting and receiving its over one-half billion dollars a year in Title

25   IV funds, every year falsely certifies to the DOE compliance with the incentive compensation ban

26   in the Agreement it submits annually to the DOE. (b) UOP falsely induces the Government to

27   approve and/or pay out the Title IV funds, based on its false promises to comply with the

28   incentive compensation ban. (c) The promises when made are false. (d) Upon making its

1    promises and certifications, UOP knowingly engages in the illegal incentive compensation

2    schemes detailed below.

3          30. (a) UOP every year also falsely asserts compliance with the incentive

4    compensation ban in "management assertion letters" written by UOP management for an annual

5    compliance audit. (b) UOP must submit to the United States Government this annual compliance

6    audit performed by an independent certified public accountant. (c) Participation in the Title IV

7    program is conditioned upon UOP submitting these audits certifying compliance with the HEA

8    incentive compensation ban. (d) UOP is ineligible to submit any claims for HEA funds unless it

9    submits this annual audit.

10          31. (a) As a required part of the audit, UOP certifies in a management assertion letter

11    that it had "not paid to any persons or entities any commission, bonus, or other incentive payment

12    based directly or indirectly on success in securing enrollments . . . for each year at issue." (b)

13    UOP knows this certification is false because UOP intentionally violates the incentive

14    compensation ban.

15          C.    UOP's Claims for the Federal Government Funds

16          32. (a) Upon entering the Program Participation Agreement with the United States

17    Secretary of Education, UOP is eligible to request the Title IV funds from the United States

18    Secretary of Education (for Pell Grant funds) or from third party lenders (for government-insured

19    loans).

20          33. (a) For Pell Grant funds, UOP submits a request for those funds directly to the

21    Secretary of the United States Department of Education. (b) The request for funds is not a

22    student application but a request prepared and transmitted by UOP to the Secretary of the United

23    States Department of Education, stating the requested amount of funds. (c) The United States

24    Department of Education transfers the Pell Grant funds electronically directly into a UOP

25    account. (d) Upon receiving the Pell Grant funds, UOP credits various UOP students for tuition

26    paid. (e) A UOP student does not request or receive a dime of the Pell Grant funds.

27          34. (a) UOP's claims for the Pell Grant funds are fraudulent. (b) When UOP requests,

28    receives and retains the Pell Grant funds, UOP knows it is ineligible for those funds because of

1  its intentional violations of the Higher Education Act incentive compensation ban. (c) UOP

2  knows that compliance with the Higher Education Act funding statute incentive compensation

3  restriction is a core prerequisite for an institution's eligibility to request and receive Title IV

4  funds.

5       35. (a) For government-insured loans, including the FFELP, UOP submits the request for

6  those funds directly to a private lender. (b) The UOP request for government-insured loan funds,

7  arranged, managed and prepared by UOP, includes a student application that *contains an express*

8  *certification by UOP that the student is an eligible student under the Title IV program.* (c) The

9  claim for government-insured loans *must* include this UOP certification. (d) UOP knows that

10  this claim for funds is false because UOP knows its students are *not* eligible under the Title IV

11  program due to UOP's violations of the HEA incentive compensation ban. (e) *Only* students at

12  eligible Title IV schools may receive credit for Title IV government-insured loan funds disbursed

13  by private lenders to educational institutions. (f) UOP's fraudulent violations of the HEA

14  incentive compensation ban make it an ineligible educational institution to request and disburse

15  Title IV funds, and thus its students are ineligible under the Title IV program. (g) The lender,

16  typically a bank, transfers the government-insured loan funds directly into a UOP account. (h)

17  Upon receiving the government-insured loan funds, UOP credits various UOP students for

18  tuition paid.

19       36. (a) UOP's claims for the government-insured loan funds are fraudulent. (b) When

20  UOP requests, receives and retains the government-insured loan funds, UOP knows it is

21  ineligible for those funds because of its intentional violations of the Higher Education Act

22  incentive compensation ban. (c) UOP knows that compliance with the Higher Education Act

23  funding statute incentive compensation restriction is a core prerequisite for an institution's

24  eligibility to request and receive Title IV funds.

25       37. (a) The United States Government pays all interest on the government-insured

26  loans while the students are enrolled in classes and during authorized grace periods. (b) The

27  loans are guaranteed by state agencies or non-profit organizations (called "guarantee agencies"),

28  and are subsidized and reinsured by the United States Department of Education. (c) If a student

1  defaults, the guarantee agency reimburses the lender.  (d) If the guarantee agency cannot collect

2  from the student, the Department of Education reimburses the agency.

3      38.  (a) The United States Department of Education monitors loan defaults of post-

4  secondary schools and calculates a "cohort default rate" every year for UOP.  (b) The Department

5  of Education calculates the loss to the United States Government relying upon this rate.

6  **D. Counselors' Enrollment Activities Determine Their Salary**

7      39.  (a) UOP enrollment counselor compensation, including salary, is based upon the

8  number of students they enroll and other enrollment activities (telephone calls, generation of

9  leads, appointments).  (b) The UOP Corporate Enrollment Department determines enrollment

10  counselor salary using a chart called a "matrix" published by that Department.

11      40.  (a) In the matrix, UOP rates counselors performance based upon enrollments and

12  enrollment recruitment activities (telephone calls soliciting students, appointments soliciting

13  students to UOP, leads, enrollments) under the following performance ratings: "always exceeds

14  expectations," "often exceeds expectations," "meets expectations," "requires improvement," and

15  "unsatisfactory."  (b) The matrix sets forth the minimum enrollment numbers and recruitment

16  activities necessary for each performance rating.

17      41.  (a) Along with the matrix charts, UOP Corporate Enrollment publishes salary

18  schedules, with a salary range and salary merit increase award corresponding to each

19  performance rating on the matrix.   (b) An enrollment counselor thus knows his or her salary

20  level, *based solely on her enrollment numbers and enrollment recruitment activities*, by

21  comparing her matrix enrollment activity level performance rating with the salary schedule

22  showing the salary for that rating.

23      42.  (a) Until recently, the matrix listed the salary level corresponding to the

24  quantitative enrollment activity level and performance rating.  (b) UOP removed the salary levels

25  from the matrix, setting forth the salary for the matrix enrollment activities in separate

26  documentation once the Department of Education began fining institutions for incentive

27  compensation ban violations.

28      43.  (a) The compensation scheme for enrollment counselors is developed, implemented

*United States of America ex rel. Hendow v. University of Phoenix*                    -10-

1   and directed by UOP Corporate Enrollment in Phoenix. (b) UOP Corporate Enrollment tracks

2   and verifies the numbers of students enrolled (called "starts") for all enrollment counselors. (c)

3   Based on these numbers, Corporate Enrollment publishes monthly reports and "stack rankings"

4   listing admissions counselors based upon their "starts."

5          44. (a) UOP meticulously tracks each counselor enrollment activities on a daily, weekly,

6   monthly, quarterly and annual basis. (b) On a daily basis, UOP posts and submits to each

7   counselor all counselors' enrollment numbers. (c) Enrollment teams throughout California meet

8   daily to review each counselor's enrollment activities for the previous day and their goals for that

9   day. (d) These meetings are called "O.S.I.R.A." meetings.

10         45. (a) Counselors submit their weekly enrollment activity levels. (b) UOP Enrollment

11  managers compile the daily and weekly numbers into monthly reports submitted to Corporate

12  Enrollment evaluating each counselors' "success" for that month.

13         46. (a) Relator Albertson, at UOP just two years, is among the highest paid enrollment

14  counselors, based upon her enrollment numbers. (b) Her salary far exceeds that of longterm

15  enrollment counselors with lower enrollment activity levels.

16         47. (a) UOP Enrollment openly admits that salary is tied to enrollment numbers. (b)

17  When Albertson interviewed for an enrollment counselor position at the UOP San Jose campus

18  in April 2000, UOP management expressly promised her salary increases based upon her

19  enrollment activities. (c) Albertson interviewed with Jennifer Rezucha, former San Jose

20  Enrollment Manager. (d) During that interview, Albertson expressed concern that the UOP

21  position paid less than her current job. (e) Ms. Rezucha, however, told Albertson that if she

22  enrolled enough students, her salary would double within her first nine months of employment.

23         48. (a) Albertson's salary history substantiates management's words. (b) Albertson's

24  starting salary was $32,000. (c) Management told her that if she enrolled 119 students in her

25  first eight months, her salary would increase substantially. (d) Albertson enrolled 148.5 students

26  and UOP increased her salary to $88,000 at the end of the eight month period. (e) Based on her

27  top enrollment activities, UOP increased her salary again to $90,640 at the end of the year.

28         **E.    Enrollment Counselors Are Rewarded with Trips, Gifts and Contest Awards**

49. (a) In addition to salary, UOP also illegally compensates enrollment counselors based upon enrollments and enrollment activities through trips, gifts and contest awards. (b) Counselors achieving enrollment numbers set by management are rewarded with "Sperling Club" trips. (c) Through the end of 1999, Sperling trips were bi-annual, based on an enrollment counselors' numbers for the half-year. (d) After 1999, UOP continued to award Sperling trips on a bi-annual basis, but trips are awarded based upon enrollment numbers achieved during a usually random three-month period.

50. (a) Hendow won "Sperling" trips to La Costa Spain Carlsbad, California, and Squaw Valley. (b) Albertson won a trip to Universal studios by enrolling 75 students during a three-month period.

51. (a) UOP also sponsors enrollment contests based upon enrollment activities, with top counselors winning for example, a Sonoma Mission Inn Hotel and Spa Package, lottery tickets or gift certificates. (b) Hendow won a Sony DVD player Fall 2002 based upon her number of new applications in September 2002. (c) A recent Northern California contest ran from January through March 2003, whereby enrollment counselors enrolling a specific number of students won the contest.

**F.    Low Enrollment Numbers Leads to Employment Termination**

52. (a) UOP places enrollment counselors failing to reach acceptable enrollment activity levels on a "performance plan" setting forth minimum enrollment activity goals. (b) Unsuccessful completion of a "performance plan" leads to termination of the counselor's employment.

**G.    UOP Pressure to Enroll Students Who Could not Qualify**

53. (a) Starting in Fall 2002, UOP became increasingly aggressive in requiring enrollment counselors to discontinue reviewing potential students qualifications to enroll at UOP. (b) Under threat of employment termination, Corporate Enrollment directed enrollment counselors to increase their enrollment numbers by disregarding potential students' qualifications to attend UOP.

54. (a) August 5, 2002, Relators' manager, Marci Miller, the San Jose campus Enrollment Manager, informed enrollment counselors that the Director of Northern California Enroll-

ment, Tim Gruber, directed all counselors to "pull all stops and get the numbers this month, because your jobs are on the line." (b) In individual meetings at each counselor's office, Ms. Miller said "do whatever it takes to get the application. It's ALL about the numbers—nothing else matters." ("Application" is UOP code term for an enrollment). (c) Ms. Miller told the counselors that their jobs were at stake, based upon their ability to increase their enrollment numbers, stating, "your jobs are on the chopping block. You're going to be put on plan and have the possibility of getting a demotion, decrease in salary, or losing your job. You need to get the application. I don't care what it takes. They figured out a way to lower your salary by demoting you, or they're going to fire you."

55. The next day, Tim Gruber, Director of Northern California Enrollment, confirmed Ms. Miller's directive.

56. (a) October 4, 2002, Ms. Miller directed the enrollment counselors to stop reviewing academic qualifications with potential students. (b) Counselors were told to stop "counseling" students and reviewing academic transcripts. (c) These counseling measures, fundamental to protect prospective students, take enrollment counselors away from enrollment activities that would otherwise be spent increasing their overall enrollment numbers.

57. (a) January 2003, Ms. Hendow discussed with Ms. Miller a recent day wherein she interviewed four potential students. (b) Three of the four would not financially qualify to attend UOP, including one single mother on welfare with three children. (c) Ms. Miller's response was that "you're going to have to make a decision," meaning Ms. Hendow was either to enroll these unqualified students or face employment termination.

## H. Defendant's "Smoke and Mirrors" Cover-up of Its Fraudulent Practices

58. (a) UOP knowingly and intentionally deceives the Department of Education regarding its violations of the HEA ban on incentive compensation for recruiters. (b) As Bill Brebaugh, head of UOP Corporate Enrollment openly brags, UOP masks its illegal compensation scheme through "smoke and mirrors" so that UOP can "fly under the radar" of the Department of Education. (c) Mr. Brebaugh repeatedly emphasizes to the enrollment counselors: "It's all about the numbers. It will always be about the numbers. But we need to show the Department of

1    Education what they want to see."

2        59. UOP's deceptive tactics include the following:

3        (a) Separate Enrollment Counselor Personnel Files. (i) UOP maintains two separate files

4    on each enrollment counselor. (ii) Corporate Human Resources maintains the "official" file,

5    while Corporate Enrollment and the local campuses maintain the other "unofficial" file upon

6    which compensation is based. (iii) The Corporate Human Resources file contains performance

7    reviews showing legitimate qualitative review criteria allegedly used to assess performance. (iv)

8    These factors include "job related skills," "working relationships," "customer service," and

9    "supervisory skills." (v) UOP does not review these factors with its counselor nor rate

10   performance based upon these factors. (vi) Corporate Enrollment (the department tracking

11   enrollment activities) and the local campuses maintain the performance reviews actually used to

12   assess performance and determine compensation, based upon illegal quantitative enrollment

13   activities. (vii) UOP reviews enrollment counselors on a daily, weekly, monthly, quarterly and

14   annual basis. (viii) At these reviews, only quantitative enrollment activities are discussed. (ix)

15   There is no discussion or review of the qualitative factors allegedly impacting performance

16   evaluation. (x) These reviews, establishing counselors' compensation, are based entirely upon

17   the counselors' quantitative enrollment activities (enrollment numbers, appointments (numbers

18   and outcome), outgoing telephone calls, and leads (generated and outcome)). (xi) Counselors'

19   quantitative performance of each activity corresponds to a performance rating (such as exceeds or

20   meets expectation) which in turn corresponds to a salary range and merit increase level.

21       (b) Matrix and Salary Levels Separated. (i) Until recently, UOP wrote the salary range

22   corresponding to the quantitative enrollment activity rating directly on the enrollment activities

23   charts ("matrix"). (ii) Once the Department of Education began fining institutions for

24   compensating based upon enrollment activities, UOP stopped publishing the salary ranges

25   directly on the Matrix. (iii) UOP now publishes the corresponding salary ranges in a separate

26   document.

27       (c) The Enrollment Activity "Code" Terms on Documents. (i) UOP renamed the category

28   concerning student "enrollments" on its various enrollment counselor evaluation forms to mask

that compensation is directly tied to enrollment numbers and activities. (ii) On the matrix, "application" is the code term for "enrollment." (iii) On the UOP weekly and monthly matrix evaluations of each counselor, "Student Info Card" or "level one card" is the code term for an "enrollment." (iv) UOP refers to its stack rankings as "stack rankings" only in their internal e-mails. The stack rankings are officially titled "Gross New Enrollments"

(d) The Renaming of Enrollment Compensation Documents. (i) UOP publishes monthly reports verifying enrollment counselors enrollment numbers. (ii) Until recently, those reports were titled "Approval of Deferred *Commissionable* Starts" (emphasis added). (iii) A "start" is an enrolled student -- a student who has agreed to a payment plan and is attending classes (two nights attended for an undergraduate; or completion of the first three-week course for a graduate student). (iv) After the federal government began prosecuting violations of the HEA recruitment ban, UOP still published the monthly reports, but renamed them "Student and Financial Status" reports or "Enrollments by Rep."

(e) UOP Salary Policy Changes: Salaries No Longer Decrease. (i) Until 1999, UOP enrollment counselors' salaries rose or fell every six months, depending upon the performance category corresponding to their enrollment activities for that evaluation period. (ii) In 1999, to decrease attention to the salary variances, UOP decided that salaries could only rise or fall annually. (iii) Fall 2000, to further mask that its compensation scheme is tied directly to enrollment activity, UOP changed its enrollment counselor salary policy so that salaries could no longer decrease.

(f) The Use of Enrollment Code Terminology. (i) Corporate Enrollment sets enrollment goals through hidden messages. (ii) For example, a fifty-year old Director set a Sperling trip enrollment goal of 50 enrollments in 2000 by announcing, "you know how old I am." (iii) Or, the enrollment goal of 52 for a particular contest was set by Corporate Enrollment by stating "you know how many states there are."

## First Cause of Action:

**Knowingly False Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.SC. § 3729(a)(1)**

60. Plaintiffs re-allege, and fully incorporate herein by reference, paragraphs 1 through

59 herein.

61. In performing all of the acts set out herein, Defendants defrauded the United States of America by knowingly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(3)), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.

62. (a) Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from January 1, 1997, through the present.

### Second Cause of Action:

**Knowingly False Records or Statements to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. §3729(a)(2)**

63. Plaintiffs re-allege, and fully incorporate herein by reference, paragraphs 1 through 60 herein.

64. By virtue of the acts described above, Defendants have knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(2)), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

65. Relators estimate that, as a proximate result of Defendants' conduct described herein, the amount of damages sustained by the United States of America is in excess of a half billion dollars per annum, from January 1, 1997, through the present.

### Prayer for Relief

WHEREFORE, Plaintiffs request the following relief:

1. Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of

*United States of America ex rel. Hendow v. University of Phoenix*                                    -16-

Defendants' actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000.00), and not more than Ten Thousand Dollars ($10,000.00), for each violation, plus three times the ~~amount of damages which~~ the United States Government has sustained, pursuant to 31 U.S.C. § 3729(a);

2.  Award to Relators, as the *Qui Tam* plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery;

3.  Award to Relators of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

4.  Punitive damages on all causes of action, to the extent allowable by law; and

5.  Such other and further relief as the Court deems proper.

### Demand for Jury Trial

Plaintiffs demand a trial by jury, pursuant to FRCP 38.

DATED:  March 3, 2004

NANCY G. KROP and
DANIEL ROBERT BARTLEY

ATTORNEYS FOR *QUI TAM* PLAINTIFFS
MARY HENDOW AND JULIE ALBERTSON


By:_____
        Nancy G. Krop

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Proof of Service

The undersigned declares he/she is employed in the county of Marin, State of California, by Daniel Robert Bartley Law Offices, P.O. Box 686, Novato, CA, 94948-0686. I am over the age of 18 and not a party to this action. I am over the age of 18 and not a party to this action.

On today's date, I caused to be served, via First Class U.S. mail,  true and correct copies of **"Second Amended Complaint for Damages, with Demand for Jury Trial"** upon counsel as follows:

| | |
|---|---|
| Jennifer Woodward, Esq. and<br>Russell Wolff, Esq.<br>Office of General Counsel<br>U.S. Department of Education<br>400 Maryland Avenue, S.W., Rm MES 4020<br>Washington, D.C.  20202-1510<br>Tel 202 401 6306 and 202 402 6304<br>Fax 202 401 9533<br>E-mail Jennifer.Woodward@ed.gov<br>E-mail Russell.Wolff@ed.gov. | Michael Hirst, Esq.<br>Chief, Affirmative Civil Litigation<br>Office of the United States Attorney<br>United States Courthouse<br>501 I Street, Suite 10-100<br>Sacramento, CA  95814<br>Tel 916 554 2781<br>Fax 916 554 2900<br>E-mail Michael.Hirst@usdoj.gov |
| Lawrence Casper, Esq.<br>Civil Division - Fraud Section<br>Commercial Litigation Branch<br>US Department of Justice<br>601 D Street, N.W., Room 6550<br>Washington, D.C. 20004<br>Tel 202 353 7950<br>Fax 202 305 7868 or 202 307 3852<br>E-mail Lawrence.Casper@usdoj.gov | Timothy J. Hatch, Esq.<br>Bryan B. Arnold, Esq.<br>Gibson, Dunn & Crutcher LLP.<br>33 South Grand Avenue<br>Los Angeles, California 90071-3197<br>Tel 213 229 7000   Fax 213 229 7520 |
| Charles J. Stevens, Esq.<br>Brad Benbrook, Esq.<br>Stevens & O'Connell LLP<br>400 Capital Mall, Suite 1400<br>Sacramento, CA  95814-4412<br>Tel 916 329 9115   Fax 916 329 9110 | |

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was executed on this 3rd day of March, 2004, at Novato, Marin County, California.

_____
Daniel Robert Bartley

*United States of America ex rel. Hendow v. University of Phoenix*