UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES ex rel | ) | |
| | ) | |
| MORSELLOR ECTOR | ) | Civil Action No.: 1:05-cv-01637-RMU |
| 505 West Baseline Road | ) | |
| Apartment 1016 | ) | |
| Tempe, Arizona 85283 | ) | |
| | ) | |
| | ) | |
| BRINGING THIS ACTION ON | ) | COMPLAINT FOR |
| BEHALF OF THE UNITED STATES | ) | VIOLATIONS OF |
| OF AMERICA | ) | FEDERAL FALSE |
| c/o Kenneth L. Wainstein | ) | CLAIMS ACT |
| United States Attorney | ) | |
| 555 4th Street, N.W. | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | JURY TRIAL DEMAND |
| - and - | ) | |
| | ) | |
| c/o Alberto Gonzales, Esquire | ) | |
| Attorney General of the United States | ) | |
| Department of Justice | ) | |
| 10th & Constitution Avenue, N.W. | ) | |
| Washington, D.C. 20530 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AXIA COLLEGE ONLINE, WESTERN | ) | |
| INTERNATIONAL UNIVERSITY | ) | |
| 4150 S. Riverpoint Parkway | ) | |
| Phoenix, Arizona 85040 | ) | |
| | ) | |
| Serve: | ) | |
| Registered Agent | ) | |
| CT Corporation Systems | ) | |
| 3225 N. Central Avenue | ) | |
| Phoenix, Arizona 85012 | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from the false claims made by Axia College Online of Western International University (hereinafter Defendant), in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

2.    The False Claims Act, originally enacted in 1863 during the Civil War, was substantially amended by the False Claims Amendments Act of 1986 and signed into law on October 17, 1986.  Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the Act.  Congress acted after finding that fraud in federal programs and procurement is pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating fraud in government contracting, was in need of modernization.

3.    The Act provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government, including attorneys' fees. The Act allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery.  The complaint is to be filed under seal for 60 days (without service on the

2

defendant during such 60-day period) to enable the Government (a) to conduct its own investigation without the defendant's knowledge and (b) to determine whether to join the action.

4.       Based on these provisions, Relator seeks to recover damages and civil penalties arising from Defendant's presentation of false claims to the United States Government in connection with Title IV, Higher Education Act (HEA) Federal Financial Aid programs. (34 CFR 668.1)

### PARTIES

5.       Relator, Morsellor Ector, is a resident of the state of Arizona and was employed by Axia College Online of Western International University (hereinafter Axia) in Phoenix, Arizona as an Enrollment Counselor from November 8, 2004 until February 2006.

6.       Relator brings this action for violations of 31 U.S.C. §§3729 et seq. on behalf of himself and the United States Government pursuant to 31 U.S.C. §3730(b)(1).  Relator has knowledge of the false statements and/or claims presented by the Defendant to the Federal Government as alleged herein.

7.       Defendant Axia is a for profit, on-line two-year educational institution headquartered in Phoenix, Arizona and does business with the U.S. Department of Education of the Federal Government in Washington, D.C. and throughout the United States. Defendant Axia, launched in March 2004, started enrolling students in the Fall of 2004, for an Associate's Degree program. It is an academic division of Western

International University which was founded in 1978 and is accredited by the North Central Association of Colleges. Axia College announced its first online graduate in the Fall 2005 edition of "The Student Link, Your Axia College Student Newsletter." According to "Take the Fast Track to Your Degree," an Axia College publication, the Defendant Axia "is a sister institution of University of Phoenix, the largest accredited university in the United States."

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title, 31, United States Code.

9.    This Court has personal jurisdiction over the Defendant because it transacts business in the District of Columbia.

10.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the defendant transacts business in the District of Columbia.

## BACKGROUND

11.    The U.S. Department of Education is an agency of the Federal Government and is located in Washington, D.C.

12.    The U.S. Department of Education administers the Federal Financial Aid programs which include the Federal Pell Grant Program, the Federal Supplemental Educational Opportunity Grant, the Federal Stafford Loan Program, the Federal Work-Study Program and the Federal Perkins Loan Program pursuant to 34 CFR Part 668.1.

4

13.    The Defendant participates in the following Title IV Federal Financial Aid programs: Federal Pell Grant Program, the Federal Supplemental Educational Opportunity Grant, the Federal Stafford Loan Program, the Federal PLUS Loan, and the Federal Perkins Loan Program. Defendant has approximately 200,000 students worldwide. Approximately 90% of the student population, which means approximately 180,000 students, receives Federal Financial Aid. The tuition at Axia College is $265 per credit hour.

14.    In order to participate in Title IV Federal Financial Aid Programs, the Defendant knowingly entered into a Program Participation Agreement with the U.S. Department of Education. In the Program Participation Agreement, the Defendant falsely stated that it was in compliance with Title 34, Chapter VI, Office of Postsecondary Education, Department of Education, Part 668, Student Assistance General Provisions, Section 668.14 (a)(1), (2), (b)(1), (22)(i) which provide:

> (a)(1) An institution may participate in any Title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary. **A program participation agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program**

5

**participation agreement that the Secretary requires the institution to meet.**

2) An institution's program participation agreement applies to each branch campus and other location of the institution that meets the applicable requirements of this part unless otherwise specified by the Secretary.

(b) By entering into a program participation agreement, an institution agrees that –(1) It will comply with all statutory provisions of or applicable to Title IV of the HEA...

**(22)(i)[The institution] will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments** or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions  regarding the awarding of title IV, HEA program funds, except that this limitation does not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive title IV, HEA program funds.  (emphasis added)

## ALLEGATIONS

15.     There are approximately three hundred (300) people employed as Enrollment Counselors by Axia in Phoenix, Arizona in the central division.  In November

6

2004, the starting salary for Enrollment Counselors was $28,000. In December 2005, the starting salary for Enrollment Counselors was increased to $33,000. As of November 2004 and to the present time, the Defendant has knowingly been providing incentive payments to Enrollment Counselors based directly or indirectly upon the Enrollment Counselors' success in securing enrollments in violation of Title 34, Chapter VI, Section 668.14(22)(i). The Defendant has intentionally increased or decreased an Enrollment Counselor's salary based directly upon the number of students the Enrollment Counselor enrolls.

16.     The Defendant advertises its on-line program throughout the United States and the world on the internet as pop-up ads on a variety of websites. Students are enrolled from throughout the United States.

17.     The Defendant has created an Enrollment Counselor Performance Matrix which delineates how many students the Enrollment Counselor must enroll in order to receive a salary increase. The matrix also provides the number of enrolled students which would result in a salary decrease. The Axia Enrollment Counselor Performance Matrix for employees with zero to six months of time with Axia, dated April 15, 2005, included the following Areas of Performance with percentages assigned to each category: Job Performance, 65%; Judgement, 8%, Communication, 4 %, Working Relationships, 5%, and Customer Service, 15%.

## BDS PERFORMANCE MATRIX 0 - 6 MONTHS

| Areas of Perform-ance | Consist-ently Exceeds Expect-ations 2 | Consist-ently Exceeds Expect-ations 1 | Often Exceeds Expect-ations 2 | Often Exceeds Expect-ations 1 | Meets Expect-ations 2 | Meets Expect-ations 1 | Requires Improve-ment 2 | Requires Improve-ment 1 | Unsatis-factory |
|---|---|---|---|---|---|---|---|---|---|
| **Job Performance 65%** Plans & Organizes work to Complete objectives - leads per month: 40% | | | | | | | | | |
| Leads generated 1st month | 48+ | 41-47 | 36-40 | 31-35 | 28-30 | 25-27 | 23-24 | 20-22 | 0-19 |
| Leads generated 2nd month | 85+ | 76-84 | 69-75 | 61-68 | 56-60 | 50-55 | 46-49 | 40-45 | 0-39 |
| Leads generated 3rd-6th month | 646+ | 599-645 | 558-598 | 517-559 | 458-516 | 400-459 | 349-399 | 300-350 | 0-299 |
| 6 month TOTAL leads | 779+ | 716-778+ | 663-715 | 609-662 | 542-608 | 475-541 | 418-474 | 360-417 | 0-359 |
| Is motivated to achieve results independently: %5 | Spends 91% or more time outside of office working with customers | | Spends 81%-90 of time outside of office working with customers | | Spends 80% of time outside office working with customers | | Spends 70-79% of time our of office working with customers | | Spends less than 70% of time outside of office working with customers |
| Uses creativity in pursuing new ideas - applications: 50% | | | | | | | | | |
| Applications from leads 1st month | 5+ | 4 | 3 | 2 | 2 | 1 | 1 | 0 | - |
| Applications from leads 2nd month | 8+ | 7 | 6 | 6 | 5 | 4 | 3 | 3 | 0-2 |
| Applications from leads 3rd-6th month | 59+ | 55 | 44 | 47 | 43 | 34 | 35 | 31 | 0-31 |
| 6 month TOTAL Applications | 72+ | 66-71 | 60-65 | 55-59 | 50-54 | 44-50 | 39-43 | 34-38 | 0-33 |

| Is conscientious in use of company resources: 5% | 91% or more of leads are from events other than job fairs and trade shows | 81-90% of leads are from events other than job fairs and trade shows | 70-80% of leads are from events other than job fairs and trade shows | 60-69% of leads are from events other than job fairs and trade shows | less than 60% of leads are from events other than job fairs and trade shows |
| --- | --- | --- | --- | --- | --- |

18.    While Axia's Online Enrollment Counselor Performance Matrix contains several categories, 65% of the matrix depends directly upon the number of new students enrolled by the Enrollment Counselor. For example, the matrix provides that an Enrollment Counselor should be evaluated as "consistently exceeds expectations 2", the highest category, if the Enrollment Counselor enrolls seventy-two (72) students during the first six months of employment. The matrix provides that an Enrollment Counselor should be evaluated as "unsatisfactory," the lowest category, if the Enrollment Counselor enrolls zero to thirty-three (33) new students during the first six months of employment. Despite the inclusion of other categories such as "judgment" which represents 8% and "communication" which represents 4%, it is generally understood by all Enrollment Counselors that their salary is solely dependent upon the number of students the Enrollment Counselor is able to convince to enroll. Given the percentages assigned to the various categories on the matrix, if an Enrollment Counselor enrolls the required number of students, the Enrollment Counselor will receive a salary increase. The other categories are included on the matrix in an intentional effort by Axia College to disguise the fact that it is paying Enrollment Counselors based directly upon the number of new students enrolled.  Axia's Online Enrollment Counselor Performance Matrix is violative of U.S.

9

Department of Education regulations sections 668.14 (a)(1), (2), (b)(1), (22) (i).

19.     The Relator and all Enrollment Counselors were and are constantly reminded of the need to increase the number of students they enroll. In the Enrollment Counselor work area, which is a large open area with cubicles, known as "the floor," there was a large Sales Board which listed the name of each Enrollment Counselor and the number of students the Enrollment Counselor has enrolled on each day. The Sales Board is a chalk board and is erased throughout the day to reflect the current number of new students each Enrollment Counselor has enrolled as of that particular day. The Sales Board is an ever present reminder, as it can be seen by all the Enrollment Counselors on the floor, of which Enrollment Counselor has enrolled a new student and the number of new students each has enrolled to date.

20.     E-mails were sent to all Enrollment Counselors on a regular basis delineating the number of new students each Enrollment Counselor had enrolled. On August 8, 2005, an e-mail was sent by Ken Wheeler, Enrollment Manager for the Defendant announcing that the Relator had enrolled the first new student for that particular day and congratulating the Relator for enrolling the new student but also reminding the Relator that he had not yet reached his required quota of new enrollees. The Relator understood that although he was being congratulated for enrolling the first new student on that particular day, that he had an obligation to meet his quota of new enrollees and that his salary was dependent on the number of new students he was able to convince to enroll. On August 9, 2005, Mr. Wheeler sent a similar e-mail to all Enrollment Counselors in which

he congratulated Enrollment Counselor Scott Smith for his recent enrollment of new students.

21.    Nathan Ries, Senior Enrollment Manager, Axia College, sent an e-mail on July 20, 2005 which the Relator and other Enrollment Counselors received where the subject was the "Leader Board." Mr. Ries said, "Awesome Job to those reps for leading the Central division!! Impressive List!!" He then listed the names of those Enrollment Counselors on the "Leader Board" with their corresponding number of newly enrolled students. Scott Smith was at the top of the list with fifteen (15) new students and John Gable was at the end of the list having enrolled ten (10) new students.

22.    On July 28, 2005, Gabriela Cojanu, Marketing Manager, Database Marketing and  Referrals, sent an e-mail to all Enrollment Counselors which the Relator received, noting that in the week of July 18 through July 24, 2005, there had been 3,426 referrals of potential students generated by 1,254 Enrollment Counselors which resulted in an average of 2.73 referrals per Enrollment Counselor.

23.    On August 3, 2005, Gabriela Cojanu, Marketing Manager, Database Marketing and Referrals, sent an e-mail to all Enrollment Counselors which the Relator received, noting that in the week of July 25 through July 31, 2005, there had been 3,392 referrals of potential new students generated by 1,222 Enrollment Counselors which resulted in an average of 2.78 referrals per Enrollment Counselor. Ms. Cojanu's e-mails are another example of the Defendant's emphasis on the number of students each Enrollment Counselor processes.

24.     On August 9, 2005, Ken Wheeler, Enrollment Manager sent an e-mail to Walter Peniston, Dustin Wolfe, Garrett Dean, Jharmel Reed, Morsellor Ector, Nicole Davis, Philip Daily, Scott Smith, Stephen Anderson, Susanne Sansone, Suzette Burton, Thomas Collins, Ushinde Bryant, and Veronica Santa Cruz Chavez entitled "REG-O-METER." Mr. Wheeler congratulated the Relator for enrolling the first student of the day and then noted that the Relator now had two (2) registered students but needed six (6) more registered students to meet his goal. A drawing of the "REG-O-METER" was included in the e-mail. On the dial of the REG-O-METER were the numbers zero (0) to twelve (12) which represented the number of students enrolled by the Enrollment Counselor. Above the number zero (0), the meter said, "call 911;" above the number two (2), the meter said, "Nice Start;" above the numbers four (4) and six (6), the meter said, "Good Day;" above the number eight (8), the meter said, "Going Strong;" above the number ten (10), the meter said, "Awesome;" and above the number twelve (12), the meter said, "You ROCK!!!". This e-mail is another example of the daily pressure placed on the Enrollment Counselors to enroll new students. The Relator and all Enrollment Counselors understood that the number of students the Enrollment Counselor was able to convince to enroll was directly related to the amount of their salary.

25.     On August 8, 2005, Ken Wheeler, Enrollment Manager, sent his REG-O-METER to the Enrollment Counselors listed in paragraph 24. This time Mr. Wheeler congratulated Scott Smith for registering a new student and then reminded Mr. Smith that he now had five (5) new registered students but he still had to register three (3) additional

new students to meet his goal. A copy of the REG-O-METER was attached showing the meter's hand pointing between the numbers four (4) and six (6) and the words "Good Day."

26.    Shawn Young, Enrollment Manager, sent an e-mail to Ben Tolley, Christie Clemens, Christopher Jones, Joey Savino, Lance Bailey, Morsellor Ector, Pierre DeWeese, Randee Dannels, Scotty McLamb and Shenita Thomas on September 27, 2005 in which he said, "Kudos to Morsell and Joey for getting the first two REG's today! Our goal is going to be 5 a day for the team. Where is the other 3 coming from? Who is going to have a Reg clear today?"

27.    Chris Boyster, Senior Manager, Central Division, sent an e-mail on January 13, 2006 to "AXIA CENTRAL ENROLLMENT" in which he congratulated Jacob Sampson for his fourteen (14) new enrollments and noted that Mr. Sampson was leading the division for the month of January 2006. He also noted that Adam Buckey and Shaun Woyak each had registered thirteen (13) new students in January and that John Aguliar had registered twelve (12) new students in January 2006. Mr. Boyster also listed the three top Enrollment Counselor teams for the month of January 2006 which were (1) Team Noguez, (2) Team Mihilli and (3) Team Moses.

28.    On January 17, 2006, the Relator's Manager, Shawn Young, sent an e-mail to his team of Enrollment Counselors noting that Pierre DeWeese had registered the first new student that day. The e-mail said "First Reg of the Day!! Way to go Pierre!!" and was accompanied by an animated figure with a horse's body and a man's head doing a dance.

29.    On January 19, 2006, the Relator's Manager, Shawn Young, sent an e-mail to his team of Enrollment Counselors congratulating Randee Dannells on enrolling a new student. The e-mail said, "Randee popped another!!!"

30.    By an e-mail dated July 22, 2005, Robert Lawrence, Senior Admissions Counselor for the Defendant informed the following Enrollment Counselors of a new contest named "Smack Down" in which teams of Enrollment Counselors competed with other teams to enroll the largest number of new students: Andy Permoda, Brian Eastman, Brian Rauch, Carlos Ulloa, Crystal G. Johnson, Jennifer Jordan, Jeremy Schulte, John Hauri, Laquosha Robinson, Matthew Wilde, Ryan Oloughlin, Ryan Winklepleck, Dustin Wolfe, Garrett Dean, Jharmel Reed, Morsellor Ector, Philip Daily, Scott Smith, Stephen Anderson, Susanne Sansone, Suzette Burton, Thomas Collins, Ushinde Bryant, and Walter Peniston. Mr. Lawrence said, "Finally some worthy competition, May the best Reps/Team win...But if you guys do manage to win, then hat's off to ya anyways.:)." The "Smack Down" contest is another example of the Defendant's aggressive sales techniques to increase the number of students each Enrollment Counselor enrolls. The "Smack Down" contest is an example of how Enrollment Counselors are evaluated based directly upon the number of people the Enrollment Counselor can persuade to enroll in Axia in violation of U.S. Department of Education rules and regulations.

31.    On August 8, 2005, Ken Wheeler, Enrollment Manager, Axia College sent an e-mail to the following Enrollment Counselors: Walter Peniston, Dustin Wolfe, Garrett Dean, Jharmel Reed, Morsellor Ector, Nicole Davis, Philip Daily, Scott Smith, Stephen

Anderson, Susanne Sansone, Suzette Burton, Thomas Collins and Ushinde Bryant, entitled "team standings" in which he said, "Take a look at the teams above us. Those are the teams that look like they can Register students better than we can. Let's make <u>THIS WEEK, OUR WEEK.</u> Keep your activity high. Get your APIN and REG. Let me know if you need help with anything." He then listed eighteen (18) teams. Team Noguez was at the top of the list with forty-six (46) Regs and Team Cobabe was at the bottom of the list with sixteen (16) Regs. Mr. Wheeler added together all of the Regs for the eighteen (18) teams and listed the total Regs for all teams as 524. A "Reg" is Axia College lingo which means an enrolled student. An APIN is Axia College lingo which means that an application has been opened for a new student but it is incomplete and thus the potential student is not yet enrolled.

32.    Chris Boyster, Senior Manager, Central Region, Axia, sent an e-mail on December 2, 2005 entitled "Snowman Contest." This was a competition among Enrollment Counselor teams as to which team could enroll the most new students. Mr. Boyster ranked the teams from one (1) to nineteen (19) based upon the number of APNDs each team had. An APND is Axia lingo which means the number of new referrals for potential students. Shawn Young's team, of which the Relator was a member, was in first place with fifty-seven (57) APNDs. The last place team only had one (1) APND.

33.    Competition between Enrollment Counselor teams to enroll the most students was standard practice at Axia. On September 29, 2005, Shawn Young, the Relator's manager, sent an e-mail listing all of the teams and the number of Regs and APINs each team had. Mr. Young noted that Pierre DeWeese, a member of his team, had

enrolled six (6) new students the prior day and had enrolled two (2) new students on September 29, 2005.

34.    Ken Wheeler, Enrollment Manager, sent an e-mail on August 10, 2005 to Enrollment Counselors listing the Enrollment Counselor teams in descending order based upon the number of new students each team had enrolled. On this day, Team Winklepleck was in first place with fifty-three (53) newly enrolled students and Team Moses was in last place with twenty-one (21) newly enrolled students.  Mr. Wheeler ended his e-mail by noting that together, the eighteen (18) teams had enrolled 631 new students.

35.    On August 19, 2005, ten (10) days after the e-mail discussed in paragraph 34, Ken Wheeler, Enrollment Manager, again listed in descending order based upon the number of newly enrolled students, the Enrollment Teams and the number of new students each had enrolled. On August 19, 2005, Team Reynolds was in first place having enrolled eighty-seven (87) new students and Team Moses remained in last place having only enrolled forty-one (41) new students.  Mr. Wheeler ended his e-mail by noting that together, the eighteen (18) teams had enrolled 1,089 new students.

36.    On August 22, 2005, only three (3) days after the e-mail discussed in paragraph 35, Ken Wheeler, Enrollment Manager, again listed in descending order based upon the number of newly enrolled students, the Enrollment Counselor Teams and the number of new students  each had enrolled. On August 22, 2005, Team Winklepleck had retaken the lead having enrolled  ninety-four (94) new students. Team Moses remained in last place having enrolled only forty-two (42) new students.  Together, the Enrollment

Counselor Teams enrolled 1,155 new students. The constancy of Mr. Wheeler's e-mails is an example of the Axia corporate culture which on a daily basis pressured the Enrollment Counselors to enroll new students. The Relator and all of the Enrollment Counselors clearly understood the need to increase the number of new students they enrolled in order to increase their salary. The Relator and all of the Enrollment Counselors understood that their salary was based directly upon the number of new students enrolled in Axia.

37.    Since November 2004, the Defendant has trained and required its Enrollment Counselors to use aggressive sales techniques in order to increase the number of enrolled students. Enrollment Counselors were provided with scripts and other sales techniques to force a prospective student to enroll.  The Defendant provided the Relator with a book entitled The Idea Book as well as numerous memorandums advising how an Enrollment Counselor can turn a prospective student into an enrolled student. The Idea Book suggests on page 7 of 59 the following conversation to encourage a student to apply for financial aid:

> They must assign value to the program before you address payment. Ask about company reimbursement. No? Are you going to allow your company to keep you from being successful? Take your ability to help them access financial aid seriously. Don't make it sound easy. You are the gatekeeper to their financing. Let them know it is normal to use financial aid. This is an investment. Most successful people become successful by using other people's money. You pay taxes? Then this educational assistance is for you!

38.    On June 8, 2005, Daniel Klingensmith, Enrollment Supervisor/Manager, Axia College wrote a memorandum to Brandon Beverly, an Enrollment Counselor entitled "Discussion Memo."  Mr. Klingensmith began the memo by stating, "[a]s we have

discussed, you were not meeting expectations for the organizational goals and objectives in your previous quarter of March 2005 to May 2005 that are used to measure your contribution as an Enrollment Counselor. You did not perform as a "Meets" expectations level and you were not facilitating as much activity (REG and APIN) as is expected." Mr. Klingensmith then listed the following goals for Mr. Beverly: "<u>Applications</u>: Goal, 3 per week" and "<u>REGs</u>: 3 per week." This memorandum informed Mr. Beverly that enrolling three (3) new students per week was a requirement of his position. Mr. Klingensmith ended the memo by stating, "Please understand that failure to attain this level of performance will lead to further disciplinary action, up to and including termination."

39.    On August 9, 2005, the Relator received a Written Warning-Amended from Nathan Ries, Senior Enrollment Manager, Axia. In this document, Mr. Ries stated the Relator's activities and actual performance for July 2005. Under the Job Performance category, there are four (4) categories listed. The Job Performance category represents 65% of an Enrollment Counselor's evaluation. In the subcategory of "Plans & organizes work to complete objectives," the "Goal" was "7.5 - 10" and the Relator's actual performance was "5." These numbers represent the goal of enrolling 7.5 to 10 students during the month of July 2005 and the Relator only registered 5 students. In the subcategory of "Is motivated to achieve results independently" the "Goal" was "80-88 hours" and the Relator's actual performance was "68." In the subcategory of "Uses Creativity in pursuing new ideas", the "Goal" was "10-15 referrals" and the Relator's actual was "0." In the subcategory "Is conscientious of company resources," the "Goal" was "6.7 - 8.7" and the Relator's actual

was "3." Each of the four Job Performance subcategories directly relate to how many new students are enrolled. In the seventeen (17) other categories which represented 35% of the evaluation, the Relator was rated "meets expectations" in thirteen (13) of the seventeen (17) categories. However, these categories are considered by Axia to be "soft skills" and of lesser importance. The Relator objected to this evaluation in writing explaining that the matrix is merely a pretext and that the only factor that was critical to his evaluation was the fact that he had not enrolled the number of students Axia required of him and all Enrollment Counselors.

40.    On August 10, 2005, the Relator received his Annual Employee Performance Evaluation from Ken Wheeler, Enrollment Manager, Axia, which mirrored the categories included in the August 9, 2005 written warning from Nathan Ries. Mr. Wheeler determined that the Relator was "unsatisfactory" in three of the four Job Performance subcategories and that he met expectation in the Job Performance subcategory of "Is motivated to achieve results independently." Mr. Wheeler included a "Performance Plan" for the Relator which included:

> Registrations - Meet expectation of a minimum of 2.5 registrations per week
> Referrals - Meet minimum expectation of 3.75 referrals per week as outlined in the enrollments counselor performance matrix
> Retention - Retain a minimum of 10 students per month
> Judgement - Have less than 10% of all registration packets returned.

Mr. Wheeler's "Performance Plan" mirrors Mr. Ries' "written warning" in that both require the Relator to enroll ten (10) new students each month in order to be considered to have "met expectations." As a result of the Relator's failure to enroll the required ten (10) students per month, his salary was decreased by 6%.

41.    Since November 2004, the Defendant has required the Relator, and all Axia Enrollment Counselors, as part of their duties to enroll new students and encourage the new students to apply for Federal Financial Aid. The Defendant has also required the Enrollment Counselors to assist the new student in the completion of the Federal Financial Aid forms. As part of the Enrollment Counselors' job, they must walk each student through the Financial Aid Web Application website screen by screen instructing the new student as to what to click on each screen. The Defendant provided the Relator and all of its Enrollment Counselors with a training manual entitled, "Financial Aid Web Application Walkthrough" which instructs the Enrollment Counselor as to how to assist the student in completing the Federal Financial Aid application. The Enrollment Counselors are trained to tell potential new students when they encourage them to apply for financial aid, "no money is coming out of your pocket."

42.    Enrollment Counselors are trained by Axia to tell the potential new student to answer yes to the following questions found on the Financial Aid Web Application:

> 1. Title IV student financial aid funds, and/or state funded student assistance may be applied to all open allowable charges, including administrative fees and charges for this academic year.

20

2. Title IV student financial aid funds and/or state funded student assistance may be applied to estimated future tuition charges (including state sales tax) and rEsource fees for the disbursement period within the academic year.

3. Title IV student financial aid funds and/or state funded assistance may be applied to my University account for outstanding charges incurred prior to this payment period, loan/Pell period, and/or academic year.

43.    The Axia catalogue provides:

Federal disbursements are made in two payments; at the beginning of the loan period and after successfully completing approximately one-half of the credits for that loan period. Any processing fees will be divided in half and deducted from both payments. **The loan check will be co-payable to the University and the student, or funds will be transferred via EFT (Electronic Funds Transfer) directly to WIU [Western International University].** (emphasis added)

44.    Since November 2004, the Defendant knowingly caused its students to apply for Federal Financial Aid while knowingly increasing and/or decreasing the salary level of its Enrollment Counselors based directly upon the number of students the Enrollment Counselor enrolled in violation of the U.S. Department of Education Program Participation Agreement. The students were required to complete a Western International University form entitled "Financial Aid Entrance Interview" which stated "16. I must repay my entire loan even if I do not complete my education, if I am not satisfied with my education, if I cannot find employment or I do not receive the educational or other services that I purchased from my school." The form was dated May 27, 2004.

45.    Since November 2004 until the present time, the Defendant received Federal Financial Aid  payments from the U.S. Department of Education in the form of checks

payable jointly to Axia and the individual student and by Electronic Fund Transfers. The Defendant intentionally received these payments from the Federal Government all the while knowing that it had falsely stated that Axia was in compliance with all of the regulations associated with the Program Participation Agreement. The Defendant intentionally received these payments from the Federal Government all the while knowing that it's manner of compensating its Enrollment Counselors violated the U.S. Department of Education's ban on incentive payments for college recruiters.

46.    The Defendant knowingly encourages the Enrollment Counselors to enroll students that are unqualified for the academic program. These same unqualified students are encouraged by the Enrollment Counselors to apply for Federal Financial Aid. The Enrollment Counselors assist these students in completing the Federal Financial Aid application forms and cause these students to apply for and subsequently receive Federal Financial Aid. As a result of Axia's aggressive sales techniques as well as its policy of admitting unqualified students, many of these students drop out before the course is completed. Many newly enrolled students drop out within the first three (3) weeks of school.

47.    The Defendant has a tuition refund policy entitled "Policy for Title IV Recipients Who Withdraw or Graduate from the University." The typical Axia on-line course is nine weeks long. In accordance with the Defendant's policy, a tuition refund/credit will occur as follows:

- ■  if a student drops out during the first week of class, 89% of the tuition/financial aid will be returned

- ■  If the student drops out after the second week of class, 78% of the tuition/financial aid will be returned

- ■  If the student drops out after the third week of class, 67% of the tuition/financial aid will be returned

- ■  If the student drops out after the fourth week of class, 56% of the tuition/financial aid will be returned

- ■  If the student drops out after the fifth week of class, 45% of the tuition/financial aid will be returned

- ■  If the student drops out any time after the sixth week of class, there will not be tuition/financial aid refund.

The Defendant knowingly enrolls unqualified students and causes them to apply for Federal Financial Aid knowing that they will drop out before the completion of the nine week course, thus permitting the Defendant to keep a large percentage of the Federal Financial Aid monies without providing educational services in exchange. The Defendant's actions cause much needed federal financial aid dollars to be diverted for use and then squandered by unqualified students who the Defendant knows or should have known when the Defendant's Enrollment Counselors encouraged the unqualified student to apply for admission and for federal financial aid that the student would not complete the program. As a result, federal financial aid dollars have been wasted because the American

taxpayer did not receive the benefit of an educated population while the Defendant increased its income.

48.    On September 27, 2005, Shawn Young, Enrollment Manager sent and e-mail inviting his Enrollment Counselors to a team meeting to be held that day at 1:30pm in Beale Room.    The Relator participated in the team meeting with other Axia Enrollment Counselors. The meeting was held in the Beale Room in the Axia College complex at 1:30 p.m.  Shawn Young led the meeting. The following Axia Enrollment Counselors were also present: Ben Tolley, Christie Clemens, Christopher Jones, Joey Savino, Lance Bailey, Pierre DeWeese, Randee Dannels, and Scotty McLamb. At the meeting, Mr. Young announced that he had attended a managers meeting in the morning of September 27, 2005 in which Sarah Boeder, the new Central Division Director, Axia College of Western International University announced that Axia College was an "open enrollment institution" and that Axia College "was not enrolling quality, we are enrolling quantity." Mr. Young also reported that Ms. Boeder said that as long as a new student was cleared by the Axia College Finance Department, that the student could attend Axia regardless of the prospective student's academic qualifications. Mr. Young instructed his team of Enrollment Counselors to enroll as many students as possible.

49.    Enrollment Counselors were trained by Axia not to turn any student away. Participation in the classes required access to a computer. Enrollment Counselors were trained to encourage students who did not own computers to use the computers in the public library for the Axia courses.

50.     An Enrollment Counselors' duties also includes assisting a new student, once enrolled, in course selection as well as the intricacies of an online academic program. Such telephone conversations can take a minimum of twenty (20) to thirty (30) minutes to complete. On the first day that a new student begins the online academic program, it is the responsibility of the Enrollment Counselor to assist that new student, who he or she has enrolled, in participating in the initial classes. This activity also takes a large amount of the Enrollment Counselor's time. Many of the highest paid Enrollment Counselors at Axia do not perform these vital functions. Instead, the highest paid Enrollment Counselors focus all of their time on enrolling new students rather than assisting new students in an effort to improve their chances for academic success because it is Axia's policy to pay Enrollment Counselors based upon the number of new students enrolled rather than on assisting a student in successfully completing the program. On a daily basis, Axia has made it clear to its Enrollment Counselors that their income is dependent directly upon the number of new students enrolled.

51.     By an e-mail dated November 15, 2005, Shawn Young, Enrollment Manager, notified Ben Tolley, Brian Bisel, Christie Clemens, Christopher Jones, Joey Savino, Lance Bailey, Morsellor Ector, Pierre De Weese, Randee Dannels, Scotty McLamb, Shenita Thomas, and Tanya Melter that "[w]e are a total of 7 REGS out of 2nd place!!"

52.     On November 17, 2005, Shawn Young sent an e-mail to his enrollment team and said, "We had a slow day yesterday and need each person to bring in 1 reg today!.. .Let's have a great day and help each other get that 1 REG EACH!" Mr. Young then listed

the number of REGs each enrollment team had as of that date with Team NeVille in first place with seventy-two (72) REGs and Team Snyder in last place with six (6) REGs. Mr. Young's team was in sixth place with fifty-three (53) REGs.

53.    On December 1, 2005, Shawn Young, Enrollment Manager, forwarded an e-mail from Tony Finn, Associate Director of Enrollment, Axia College of Western International University in which Mr. Finn outlined how an Enrollment Counselor could qualify for overtime during December 2005. Mr. Finn stated that "Veteran" Enrollment Counselors with twelve (12) or more new enrollments during November 2005, would be eligible for ten (10) hours of overtime per week in December 2005 and those with eight (8) to ten (10) new enrollments in November would be eligible for five (5) hours of overtime if they met the minimum "requirements on the soft skills of the matrix, as well." If the Enrollment Counselor dropped below twelve (12) and eight (8) new enrollments respectively during the month, the overtime would be "adjusted or removed accordingly." The offer of overtime was not a function of the work that needed to be completed but rather an immediate financial reward of a temporary increase in income for those Enrollment Counselors who had achieved the required number of enrollments. Overtime was paid at the rate of 1 and ½ times the Enrollment Counselor's salary.

54.    Officially, all Axia Enrollment Counselors are full-time employees expected to work forty (40) hours per week. However, if an Enrollment Counselor was able to enroll a sufficient number of students in less than forty (40) hours per week, that Enrollment Counselor was permitted to work less but was paid not based upon the number of hours

26

worked but the number of new students enrolled. Derrick Smith was an Enrollment Counselor who was permitted to come in to work and leave whenever he wanted because he enrolled a large number of new students. Matthew, last name unknown, was allowed to take off four (4) days without submitting a leave slip because he met the quota of new enrollees.

55.     Axia College issued a report to its Enrollment Counselors entitled "Projected Start Ranked Report for Current Performance Month (9/1/2005 - 9/30/2005)" in which all of the Enrollment Counselors were ranked in descending order by the number of new students enrolled. The names of approximately two hundred (200) Enrollment Counselors were listed. The top twelve (12) Enrollment Counselors were: Scott Smith, Chauncy Breiby, Amy Thibodeaux, Andy Permoda, John Gable, Megan Edwards, Michael Voels, Brett Monson, Lisa Phillips, Jacob Samson, Ryan Stiltz and Jeff Weitz. Scott Smith was in first place with seventeen (17) REGs for this time period.

56.     Axia College issued a report to its Enrollment Counselors entitled "Projected Start Ranked Report for Current Performance Month (11/1/2005 - 11/30/2005)" in which all of the Enrollment Counselors were ranked in descending order by the number of new students enrolled.  The names of 213 Enrollment Counselors were listed. The top twelve (12) Enrollment Counselors were: Joshua Ellis, Jeff Weitz, Danny Price, Christie Clemens, Edward Garvin, Julie Vines, John Gable, Sherman Davis , Lawrence Nichols, Ty Perkins, Jeremiah Anderson and Dawn Seidner.  Each had ten (10) REGs for this time period.

57.    Axia College issued a report to its Enrollment Counselors entitled "Projected Start Ranked Report for Current Performance Month (1/1/2006 - 1/31/2006)" in which all of the Enrollment Counselors were ranked in descending order by the number of new students enrolled. The names of 201 Enrollment Counselors were listed. The top twelve (12) Enrollment Counselors for this month with their respective number of newly enrolled students were: Jacob Samson (18), Adam Buckey (14), Shaun Woyak (13), Ryan Stiltz (13), John Aguilar (13), Mona Kirksey (12), Sean Shivers (12), Rosanne Sesmas (12), Walter Peniston (11), Dana Stombaugh (11), Heather Murdy (10), and Thomas Dorsey (10). The Enrollment Counselors who were in the bottom seventeen (17) had not enrolled any new students during this month. The Relator enrolled three (3) new students during January 2006.

58.    A similar report was issued by Axia College entitled "776C Manager Comparison Report for Current Performance Month (11/1/2005 - 11/30/2005)." This report listed managers in descending order by the number of new students enrolled by their teams. The top performing team was managed by Garrett Miles and the team enrolled forty-six (46) new students during the month of November 2005. The report included 116 teams. The bottom nine (9) teams did not enroll a single student during the month of November 2005. A total of 2,681 students were enrolled by the 116 teams during November 2005. Such performance ranking comparison reports were routinely issued and were a constant reminder to Enrollment Counselors to increase the number of new students enrolled in order to increase their salary.

28

59.    A report was issued by Axia College entitled "776C Manager Comparison Report fo Current Performance Month, (8/1/2005 - 8/31/2005)."  The report listed the names of all managers in descending order based upon the number of students each manager had enrolled.  The following represents the top ten (10)  names on the list which included eighty-nine (89) managers and the number of their registered students, (REG), the number of their prospective students whose enrollment paperwork had begun but was incomplete, (APIN) and the number of leads/referrals, (APND).

| Manager | REG | APIN | APND |
|---------|-----|------|------|
| Garrett Miles | 23 | 0 | 136 |
| Ted Yeager | 21 | 29 | 145 |
| Shaun Condie | 21 | 8 | 172 |
| Chris Felton | 20 | 13 | 380 |
| Abe McHatton | 20 | 7 | 167 |
| Ben Papa | 19 | 14 | 122 |
| Matthew Stewart | 19 | 3 | 130 |
| Ben Brown | 18 | 21 | 322 |
| Krashawnda Graves | 18 | 15 | 275 |
| Randy Thomas | 18 | 14 | 249 |

Josh Ragsdale was in last place having not registered any students and only having one (1)  APIN and one (1) APND.  The report reflects that together, the eighty-nine (89) managers had enrolled  801 students, had 859 APINs and 13,944 APNDs during the time period of August 1 to 31st, 2005.

60.    Enrollment Counselors who were in the top 20% based upon the number of new students enrolled as compared to other Enrollment Counselors were rewarded with an immediate increase in income through eligibility for overtime pay but were also rewarded by being supplied names of potential new students to call to encourage to enroll

29

from the Quality Control Tracking System (QC). Names referred to the Enrollment Counselors by the QC were people who had responded to the various pop-up advertisements on a variety of internet sites and had been pre-screened to verify the accuracy of the information thus enabling the high producing Enrollment Counselor to avoid wasting time calling wrong telephone numbers and those who had not indicated an interest in Axia College, thus increasing the likelihood of enrolling additional students and raising their income.

61.     On occasion, Enrollment Counselors who had enrolled a new student on the prior day would be rewarded by receiving the names of prospective students from the QC list which would enhance the Enrollment Counselors' opportunity to enroll a new student and therefor increase the Enrollment Counselors' income. Enrollment Counselors who did not qualify for referrals from the QC list were assigned to make completely "cold calls" to see if they could interest people, who had not evidenced any interest in Axia College, in enrolling in Axia. Therefor, those Enrollment Counselors recruiting new students by making "cold calls" were less likely to enroll a new student and therefor less likely to increase their income.

62.     On September 29, 2005, Shawn Young, Enrollment Manager sent an e-mail to his team of Enrollment Counselors stating: "Great job yesterday! . . . We put in 6 Regs and Pierre has already got 2 Reg's this morning. . . We cleared more Reg's yesterday than any other team in Central! Let's do it again!" Mr. Young then listed eighteen (18) teams and the number of Reg's and APINs each team had.

63.     On October 13, 2005, Sarah Boeder, then Division Director, Central Region, Axia College of Western International University, sent an e-mail to: Tony Finn, Treven Nuttall, Brandon Sheahan, Cody Neville, Courtney Palmore, Darrin Moses, Elizabeth Noquez, Jacob Mavity, Jared Wallentine, Jason Kimmell, Jason T. Cobabe, Jeffrey Reynolds, Jessica Dembrosky, Ken Wheeler, Michael Hilton, Natalia Mihilli, Ryan Winklepleck, Shawn Young and Nathan Ries with the subject: "Re: Enrollment Tracking Sheet - 10/13" in which she said: "I am very impressed this morning with: Team Winklepleck - 9 yesterday! Team Young and Neville with 7 each yesterday. . . and Team Mavity, Nuttall and Wheeler with 5! Thanks so much for getting it done yesterday!:-)" In this e-mail, Ms. Boeder is congratulating the teams for the number of new students enrolled on a particular day.

64.     Tony Finn, Associate Director of Enrollment sent an e-mail dated October 13, 2005 to Treven Nuttall, Brandon Sheahan, Cody Neville, Courtney Palmore, Darrin Moses, Elizabeth Noquez, Jacob Mavity, Jared Wallentine, Jason Kimmell, Jason T. Cobabe, Jeffrey Reynolds, Jessica Dembrosky, Ken Wheeler, Michael Hilton, Natalia Mihilli, Ryan Winklepleck, Shawn Young, Sarah Boeder, Nathan Ries with the subject: "Enrollment Tracking Sheet - 10/13" sending the following chart which states that each team was "budgeted" to register ninety (90) new students for the month of October 2005.

| Need to Hit BUDGET | Per Day 8 | As of 10/13/2005 | October | | | |
|---|---|---|---|---|---|---|
| | | | REG | APIN | TOTAL | YOUR BUDGET |
| -57 | -7 | Team Cobabe | 33 | 17 | 50 | 90 |
| -50 | -6 | Team Dembrosky | 40 | 24 | 64 | 90 |
| -42 | -5 | Team Hilton | 48 | 19 | 67 | 90 |
| -42 | -5 | Team Kimmell | 48 | 10 | 58 | 90 |
| -29 | -4 | Team Mavity | 61 | 13 | 74 | 90 |
| -51 | -6 | Team Mihilli | 39 | 16 | 55 | 90 |
| -15 | -2 | Team Moses | 75 | 14 | 89 | 90 |
| -27 | -3 | Team NeVille | 63 | 6 | 69 | 90 |
| -49 | -6 | Team Noguez | 41 | 7 | 48 | 90 |
| -48 | -6 | Team Nutall | 42 | 3 | 45 | 90 |
| -51 | -6 | Team Palmore | 39 | 17 | 56 | 90 |
| -48 | -6 | Team Reynolds | 42 | 5 | 47 | 90 |
| -57 | -7 | Team Seymore | 33 | 3 | 36 | 90 |
| -60 | -8 | Team Sheahan | 30 | 16 | 46 | 90 |
| -44 | -6 | Team Wallentine | 46 | 19 | 65 | 90 |
| -24 | -3 | Team Wheeler | 66 | 9 | 75 | 90 |
| -23 | -3 | Team Winklepleck | 67 | 11 | 78 | 90 |
| -45 | -6 | Team Young | 45 | 3 | 48 | 90 |
| -762 | -95 | | 858 | 212 | 1070 | 1620 |

65.    In an e-mail dated October 31, 2005, Shawn Young, Enrollment Manager, reminded his team of Enrollment Counselors that a new top 20% rankings list would be calculated for the following month. This was another reminder to the Enrollment Counselors that an opportunity to increase their income was directly dependent upon the number of new students they were able to convince to enroll.

66.    In an e-mail dated October 25, 2005, Sarah Boeder, Division Director, Central Region, Axia College of Western International University, announced the promotion of Nathan Ries in which she said "Nathan was promoted to Senior Manager in August 2004 to start Axia Central from the ground up and led the division to over 10,000 cleared enrollments in the first year." On that same day, Mr. Ries sent an e-mail to Enrollment Counselors congratulating them for the number of new students they had enrolled and listed, in descending order, the actual number of students enrolled by each Enrollment Counselor.

67.    Shawn Young, Enrollment Manager, sent an e-mail on November 1, 2005 to his team of Enrollment Counselors and stated "Next to the Reg Board is a list that tracks your Regs for the week. The goal is 3 per week for Success. It will get everyone to their monthly goal and get you on QC [quality control] for the whole next week. Lance has 1, Brian has 2, Tanya has 2, Joey has 1 so far. When you get a Reg cleared, hang up our Turkey leg guy and put your student's name on your success line!"

68.    In an e-mail dated September 30, 2005, Shawn Young, Enrollment Manager, forwarded an e-mail from Tony Finn, Senior Enrollment Manager in which Mr. Finn stated, "The cutoff for Oct Top 20% is 9+. Top 20% for QC [quality control]  and OT [overtime] starts Monday (10/3)." The number 9+ referred to the number of new students enrolled.

69.    Nathan Ries, Senior Enrollment Manager, sent a memorandum dated October 25, 2005 which states, "Congratulations to the counselors that are leading the way in October! Impressive List!" Mr. Ries then listed the following names with the number of

Reg's beside each name. The first fifteen (15) people of the forty-six (46) listed were the following: Andy Permoda, 24; Scott Smith, 24; Jacob Samson, 22; Walter Peniston, 20; Debra Abrams-Ozolnieks, 18; Dacey Thomas, 18; Megan Edwards, 18; Adam Buckey, 18; Tre Williams, 17; Ryan Stiltz, 17; Randee Dannels, 16; Jennifer Jordan, 15; Ryan O'Loughlin, 15; Stacey Snyder, 15; Rosanne Sesmas, 14." Mario Rodriguez tied with eight (8) others for last place with ten (10) Reg's each.

70.     On November 30, 2005, Shawn Young, Enrollment Manager, sent an e-mail to Enrollment Counselors reminding them that they had "14 days left to hit your goal." The e-mail included a list of the Enrollment Counselors and the number of students each had enrolled to date in descending order based upon the number of enrolled students.

71.     On December 12, 2005, Shawn Young, Enrollment Manager sent an e-mail to the following Enrollment Counselors: Ben Tolley, Brian Bisel, Christie Clemens, Christopher Jones, Joey Savino, Lance Bailey, Morsellor Ector, Pierre DeWeese, Randee Dannels, Scotty McLamb, Shenita Thomas, and Tanya Melter. The e-mail was entitled "Team Rankings" and Mr. Young said, "Christie has started our day off with a REG this morning. Morsell is back this morning processing a REG also! Let's get everyone to have 3 REGS this week! SECRET TO REGS: DON'T TELL ANYONE, BUT IF A STUDENT GETS ON THE APPLYWEB, THEY CAN EVENTUALLY BECOME A REG! With 2 days left in the Apply Web contest, we are only 9 Applywebs away from getting QC next week! Get as many students to the apply web as possible!" Mr. Young then listed the number of REGs and APINs each team had.

72.     On December 1, 2005, Shawn Young, Enrollment Manager, wrote an e-mail to his team of Enrollment Counselors entitled, "December OT Criteria" in which he said, "Kudos to Joey, Randee, and Christie for making the criteria for OT [overtime] this month. Some extra holiday money!!!"

73.     On December 1, 2005, Shawn Young, Enrollment Manager, wrote an e-mail to his team of Enrollment Counselors entitled "Happy December!" Mr. Young said, "Today is Reg Day! . . . Today's goals: 1. Build 5 new APNDS for your PSL today. VERY IMPORTANT! 2. 1-2 new Apply web hits 3. 1 Reg each."

74.     The Relator alleges that the following Axia Enrollment Counselors each enrolled a large number of new students: David Stone, Steve Anderson, Derrick Smith, Adam Buckey, Renee Hovden, Everett McCrea, Mason Benner, Jessica Martinez, Deshawn Anderson and Stefanie Skousen. As a result of their success in enrolling a large number of new students, these Enrollment Counselors received significant salary increases.

75.     The Relator alleges that Deshawn Anderson, an Axia Enrollment Counselor was paid a salary of $80,000 as a direct result of his success in convincing a large number of new students to enroll in Axia College.

76.     The U.S. Department of Education issued a report in January 2004 entitled "Program Review Report, PRCN 200340922254, University of Phoenix, OPEID 020988 00, Site Visit of 8/18/2003 - 8/22/2003" in which it concluded that the University of Phoenix "Violated Incentive Compensation Prohibitions and Breached Its Fiduciary Duty. The sales philosophy at UOP is designed around evasion and relies upon euphemisms to avoid

detection by the Department. UOP systematically established terminology and procedures to hide the fact that UOP pays distinct and significant financial incentives solely based on recruiters' success in securing enrollments." As Axia College refers to the University of Phoenix as its "sister institution" in its promotional catalogues, the Defendant, based upon the U.S. Department of Education report, knew or should have known in the fall of 2004 when Axia College began enrolling its first students, that the system for compensating Enrollment Counselors at the newly established Axia College was in violation of Title 34, Chapter VI, Office of Postsecondary Education, Department of Education, Part 668, Student Assistance General Provisions, Section 668.14 (a)(1), (2), (b)(1), (22)(i). The newly created Axia College Enrollment Counselors compensation system significantly mirrored the UOP compensation system which the U.S. Department of Education determined to be non-compliant nine months before the opening of Axia College.

77.    The Defendant knowingly submitted or caused to be submitted false and fraudulent Program Participation Agreements to the Federal Government in order to be qualified to have its students apply for and the Defendant receive Federal Financial Aid payments.

78.    The Defendant knowingly submitted and caused its students to submit claims for payment to the Federal Government for Federal Financial Aid monies knowing that Defendant Axia was not qualified to participate in the Federal Financial Aid programs because Axia's manner of compensating its Enrollment Counselors was directly related to the number of students that the Enrollment Counselor enrolled in violation of Title 34,

Chapter VI, Part 668, Section 668.14 (22) (i).

79.     The Defendant knowingly received and caused its students to receive Federal Financial Aid monies knowing that Defendant Axia was not qualified to participate in the Federal Financial Aid programs because Defendant Axia's manner of compensating its Enrollment Counselors was directly related to the number of students that the Enrollment Counselor enrolled in violation of Title 34, Chapter VI, Part 668, Section 668.14 (22) (i).

80.     On December 1, 2005, Janice Melvin on behalf of Todd Nelson, Chief Executive Officer, Apollo, sent an e-mail to all "exchange users." The Relator received this e-mail on December 1, 2005. The e-mail said, "In the next few weeks, Axia College will become a college of the University of Phoenix and will no longer be a part of Western International University."

## COUNT I

*(False Claims Act 31 U.S.C. §3729(a)(1) and (a)(2))*

81.     Relator realleges and incorporates by reference the allegations made in paragraphs 1 through 80 of this Complaint.

82.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§3729-32.

83.     By virtue of the acts described above, the Defendant knowingly submitted, caused to be submitted and continues to submit and to cause to be submitted false or fraudulent claims for payment and reimbursement by the United States Government through the vehicle of the Federal Financial Aid programs.

84.    By virtue of the acts described above, the Defendant knowingly made, used or caused to be made or used, and continues to make or use or cause to be made or used, false statements to obtain Federal Government payment for false or fraudulent claims.

85.    The United States Government has been severely damaged as the result of Defendant's fraudulent statements that Axia was in compliance with the U.S. Department of Education Program Participation Agreement. The United States Government has been severely damaged by the Defendant's violations of the False Claims Act.

86.    As set forth in the preceding paragraphs, Defendant violated 31 U.S.C. §3729 and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

## COUNT II
*(False Claims Act, 31 U.S.C. §3729 (a)(3)*

87.    Relator  realleges and incorporates by reference the allegations made in Paragraphs 1 through 86 of this Complaint.

88.    This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. §§3729-32.

89.    By virtue of the acts described above, the Defendant defrauded  the United States by getting false or fraudulent claims paid when it caused its students to apply for and receive Federal Financial Aid.

90.    The United States, unaware of the falsity of the records, statements and/or claims made by Defendant, and in reliance on the accuracy thereof, paid and may continue to pay for aforementioned false claims as a result of the fact that the Defendant's students

continue to apply for and receive Federal Financial Aid monies while the Defendant is not in compliance with its U.S. Department of Education Program Participation Agreement because it pays its Enrollment Counselors based upon the number of students enrolled.

91.     By reason of these actions and payments, the United States Government has been damaged and continues to be damaged in substantial amounts. The exact amount of the damage is to be determined at trial.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendant as follows:

1.     That Defendant cease and desist from violating 31 U.S.C. §3729;

2.     That this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729; et seq.

3.     That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4.     That Relator be awarded all costs and expenses of this action, including attorneys' fees;

5.     That Relator recovers such other relief as the Court deems just and proper.

Respectfully submitted,

ASHCRAFT & GEREL, LLP

_H. Vincent McKnight, Jr._

H. Vincent McKnight, Jr.
D.C. Bar No. 293811
2000 L Street, N.W., Suite 400
Washington, D.C. 20036
(202) 783-6400
ATTORNEY FOR RELATOR

Relator hereby demands trial by jury.

_H. Vincent McKnight, Jr._

H. Vincent McKnight, Jr.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Amended Complaint was mailed, postage prepaid, this 23rd day of October  2006, to:

Kenneth Wainstein, Esquire
United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Alberto Gonzales, Esquire
Attorney General fo the United States
U.S. Department of Justice
10th and Constitution Avenue, N.W.
Washington, D.C. 20530

Registered Agent for Axia College
CT Corporation Systems
3225 N. Central Avenue
Phoenix, Arizona 85012

_H. Vincent McKnight, Jr._

H. Vincent McKnight, Jr.